FILED
2020 Sep-25  AM 09:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | |
|---|---|
| **KIMBERLY KAY OWENS** ) | |
| ) | |
|     **Plaintiff** ) | |
| ) | |
| **vs.** ) | **CIVIL ACTION NO. 4:18-CV-01082** |
| ) | |
| **ANDREW SAUL,** ) | |
| **ACTING COMMISSIONER OF** ) | |
| **SOCIAL SECURITY** ) | |
| ) | |
|     **Defendant** ) | |
| ) | |
| ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On February 6, 2015, the claimant, Kimberly Owens, protectively applied for disability and disability insurance benefits under Title II of the Social Security Act, and for supplemental security income under Title XVI. (R. 10).  The claimant initially alleged disability beginning May 1, 2014 because of obesity, depression, anxiety, a personality disorder, and diabetes. (R. 13). The Commissioner denied the claims on July 31, 2015. (R. 10). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on July 26, 2017. (R. 10).

In a decision dated September 26, 2017, the ALJ found that the claimant was not disabled as defined by the Social Security Act, rendering her ineligible for Social Security benefits. (R. 7, 11). On May 18, 2018, the Appeals Council denied the claimant's request for review. (R. 1). Consequently, the ALJ's decision became the final decision of Social Security Administration Commissioner. The claimant has exhausted her administrative remedies, and this court has

jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES and REMANDS the decision of the Commissioner.

## II. ISSUE PRESENTED[1]

Whether the ALJ's reasons for discounting the opinions of claimant's examining psychologist Dr. David Wilson lack substantial evidence in the record.

## III. STANDARD OF REVIEW

The standard of review for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 128 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. But this court does not review the Commissioner's factual determinations *de novo*. The court must affirm those factual determinations supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that

---

[1] The claimant raises other issues regarding the weight afforded to treating physician Dr. Reiland's opinion and the inadequacy of the hypothetical the ALJ presented to the vocational expert. However, because the court will reverse and remand on the issue of weight afforded to Dr. Wilson's opinion, the court will not address those issues in this opinion.

would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Whether the claimant meets the listing and is qualified for Social Security disability benefits is a

question for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or

substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210

(11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of

certain facts, the court has no power to reverse that finding as long as substantial evidence in the

record supports it.

 The court must "scrutinize the record in its entirety to determine the reasonableness of the

ALJ's factual findings." *Walker*, 826 F.2d at 999. And a reviewing court must not only look to

those parts of the record that support the decision of the ALJ, but also must view the record in its

entirety and take account of evidence that detracts from the evidence relied on by the ALJ.

*Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

 For Social Security disability claims filed on or before March 27, 2017, the ALJ

considered and weighed medical opinions applying the rules in 20 C.F.R. § 404.1527.  Because

the claim in this case was filed in 2015, the rules in § 404.1527 apply.  The ALJ "must state with

particularity the weight given to different medical opinions" and the reasons for his finding; the

failure to do so is reversible error. *Romeo v. Comm'r of Social Security*, 686 F. App'x 731, 732

(11th Cir. 2017) (citing *Winschel v. Comm'r of Social Security*, 631 F.3d 1176, 1179 (11th Cir.

2011)). The ALJ's stated reasons must be legitimate and supported by the substantial evidence in

the record. *See Tavarez v. Comm'r of Social Security*, 638 F. App'x 841, 847 (11th Cir. 2016)

(finding that the "ALJ did not express a legitimate reason supported by the record for giving [the

consulting physician's] assessment little weight.").

In determining the weight to give medical evidence, an ALJ must consider whether a medical opinion is well-supported and consistent with the record. *Hargress v. Comm'r of Soc. Sec.*, 883 F.3d 1302, 1305 (11th Cir. 2018). "These factors apply to both examining and non-examining physicians." *Huntley v. Social Security Administration, Commissioner*, 683 F. App'x 830, 832 (11th Cir. Mar. 29, 2017) (citations omitted).

## V. FACTS

The claimant was forty-seven years old at the time of the ALJ's final decision; has completed one year of college; has past relevant work as a cashier and assistant manager; and alleges disability based on obesity, depression, anxiety, personality disorder, and diabetes. (R. 59-60, 62).

### *Physical and Mental Impairments*

The claimant has sought treatment for anxiety and depression since 2014. On August 14, 2014, Nurse Practitioner Phillip Rogers at Quality of Life noted that the claimant presented with anxious and fearful thoughts, depressed mood, difficulty sleeping, excessive worry, fatigue, and restlessness. She reported fear going out in public and being fired from her job because of her anxiety. She also reported chronic pain, nausea, sweating, weight gain, numbness and tingling in her hands, and "blue toes" for two years and asked NP Rogers to test her for diabetes. He assessed that the claimant had peripheral vascular disease, benign hypertension, and chronic depression. He prescribed gabapentin for her vascular disease; continued metoprolol and nifedipine for her hypertension; indicated "may need to stop Effexor," a medication used to treat depression; and referred her for mental health treatment. (R. 446-451).

Between August 2014 and June 16, 2015, the claimant sought mental health treatment at CDE Mental Health Center on nine occasions. During these visits with her counselors and

psychiatrist Dr. Richard Grant, the claimant revealed a long history of neglect, physical abuse, and sexual abuse that included being raped at six years old by a babysitter.  She consistently complained of "extreme anxiety" that made it hard to be in public and hard to leave her home; panic attacks, racing thoughts, and trouble sleeping.  On January 29, 2015, she reported that Effexor was helping with her depression, but she was having anxiety attacks more often and "difficulty completing intimate acts" and sleeping.

By March 13, 2015, her anxiety was worse; she had daily panic attacks; and she had to quit her job because of her severe anxiety. Dr. Grant reported her progress as "fair" on June 15, 2015. But on June 16, 2015, the claimant reported that she was having daily panic attacks; did not do well in crowds; felt overwhelmed; had to have a family member with her if she went out in public; and felt like someone was going to harm her.  Her diagnoses included "Agoraphobia with panic disorder" and "Problems w/ social environment, occupational problems, other psychological and environmental problems."  (R. 424-440, 514-517, 520-525, 551-560).

At the request of the Social Security Administration, the claimant completed a "Function Report-Adult" on March 19, 2015. In that report, the claimant stated that she had memory problems and would forget to eat or feed her family on her "bad days"; that she could not pay attention for ten to fifteen minutes at a time on her "good days"; and that she is easily distracted and unable to follow instructions. To compensate for these issues, the claimant stated that she uses notes and her husband helps her remember to take medication. (R. 310-312).

When she is "on a low," the claimant can go days without bathing. The claimant indicated that, on her "good days," she can do basic household chores, including vacuuming, laundry, and washing dishes. (R. 310-312).

Regarding her interests and activities, the claimant reported that she is able to go outside alone for doctor visits when the doctor will not have to touch her, and she can pick up her son from school at least once a week. Outside of these circumstances, the claimant's husband has to be with her. She also indicated that she can pay bills, count change, handle a savings account, and use a check book. However, the claimant indicated that her husband has taken over all money matters because of her scattered thoughts and mental condition. The claimant also indicated that she can focus for at least one hour at a time when she reads, but she has to "re-read pages all the time." (R. 312, 314).

In interacting with others, the claimant described several limitations. She does not spend time with anyone other than her family. She reported that she has a great difficulty getting along with others. She was "let go from a job [she] had for 9 years because [she] had gotten to the point [she] couldn't talk to her new District Manager without making her mad or confusing her." The claimant claimed that she "can't even go to [her] son's school event without having a panic attack and throwing up." She experiences "new" fears, such as having others touch her, meeting new people, going to new places, and even fear of having her child hug her.  She doesn't handle stress at all and cannot handle changes in routine. (R. 315-16).

The claimant stated that she could barely speak to her family and she has difficulty talking on the phone. She freezes up and panics; her heart starts to pound; her vision "goes"; she hears roaring in her ears; she gets nauseous and sometimes throws up; and her whole body starts to shake.  Her son tries to hug her and make it better, but his touch makes it worse. She cries "all the time."  (R. 317).

On May 15, 2015, the claimant saw Dr. James McCain at Quality of Life, for hypertension, depression, anxious thoughts, chronic pain, nausea, numbness and tingling in her

hands, and discoloration in her feet.  Dr. McCain diagnosed peripheral vascular disease, chronic depression, chronic tobacco abuse, and chronic benign hypertension.  Dr. McCain noted that he "[m]ay need to stop Effexor" for her depression because of her anxiety.  (R. 533-550).

The claimant saw a clinical neuropsychologist Dr. Samuel Fleming, III, on July 22, 2015 at the request of Disability Determination Services.  She told Dr. Fleming that she was "emotionally abused by her father and paternal grandparents[, was] physically abused by one of her stepfathers[, and was] sexually molested when she was five years of age by a neighbor and that she lost her virginity at eight years of age to a 15 year old boy in the neighborhood." She reported that her anxiety and post-traumatic stress disorder symptoms started a "number of years ago," but worsened after her home burned down, she was fired from her job, and her 12-year-old son was injured in a motorcycle accident. She told Dr. Fleming that she "continues to experience anxiety attacks and has become socially withdrawn"; has an "obsessive compulsive behavior of counting by two's"; has anxiety "when in crowds, in new situations, or when around loud noises"; and suffers from "'inner shakes,' nausea, and fidgeting."  She said she took Viibryd 40 mg once daily for her depression and anxiety.  (R. 526-528).

Dr. Fleming stated that during the examination the claimant had "no unusual mannerisms"; "was cooperative and displayed a good attitude"; and had coherent and goal-directed speech.  He noted that the claimant reported depressive symptoms, "including insomnia, restless sleep, variable appetite, low energy level, daily crying spells, [and] frequent blue spells. She admitted to suicidal ideation but denied intent."  But Dr. Fleming noted that the claimant "did not evidence any depressive symptoms during the evaluation."  (R. 527).

The claimant told Dr. Fleming that she can perform routine household chores; she enjoys reading; and "her only social activity is attending church."  (R. 528-29).

In a section labeled "Sensorium and Cognition," Dr. Fleming indicated that the claimant was oriented to person, place, time, and situation; had appropriate affect; could perform serial sevens, count backward from twenty to one and perform word problems; and had adequate immediate recall. But Dr. Fleming found that the claimant had deficient delayed recall because she could only recall two of five objects within five to ten minutes; had deficient abstract abilities because she could not tell the similarities between a dog and a lion and could not explain the proverbs "Shallow brooks are noisy" or "Two wrongs don't make a right"; and had deficient insight and judgment.  (R. 527-528).

Dr. Fleming noted that the claimant "did not demonstrate good psychological insight. She did not accept responsibility for her problems. She does appear to recognize a need for psychotherapeutic assistance; however this seems to be more a desire for attention rather than recognition for her need to work on problem issues."  (R. 528).

Dr. Fleming's diagnoses of the claimant included "Major Depression, recurrent, mild," and "Dependent Personality Disorder," but he stated that she has a "good prognosis if she can receive outpatient therapy and her secondary pain can be reduced."  He said that the claimant was "adequately motivated and cooperative and seemed to enjoy the attention."  (R. 528-529).

He concluded that the claimant could manage financial benefits; function independently; understand, carry out, and remember instructions; and respond appropriately to supervision, coworkers, and work pressures in a work setting.  (R. 529).

Between October 26, 2015 and August 9, 2016, the claimant sought mental health treatment approximately twenty times with LPC Simpson and Dr. Barnett at both Grand View Behavioral Health Centers and Southeastern Psychiatric.  During these visits, the claimant complained of sad moods, feelings of worthlessness, crying spells, decreased motivation, fatigue,

anxiety, dread, and panic attacks. Dr. Barnett prescribed Klonopin, Prozac, and Ambien for her symptoms, and increased those medications in January 2016. By March 30, 2016, Dr. Barnett described her progress as "fair" and noted on May 2, 2016 that the claimant had made "good progress" when she went to the grocery store alone. But on May 23, 2016, the claimant had a panic attack during her session. On June 13, 2016, the claimant described that "I feel more like me" and that she could interact better, but she still had anxiety and had to force herself to go out "even on bad days." (R. 566-607).

On September 14, 2016, the claimant saw Dr. Debora Reiland, for a new onset of Type 2 diabetes with hyperglycemia and weight gain of 40 pounds over the previous few months. The claimant told Dr. Reiland that she has anxiety issues and problems going into large groups but had no depression symptoms the past few weeks. She complained of fatigue, weakness, back pain, bone pain, and joint pain and stiffness. During the physical examination, Dr. Reiland noted "lumbar paraspinal tenderness" and "abnormal reduced monofilament sensation" in her feet. Dr. Reiland diagnosed the claimant with Type 2 diabetes, benign essential hypertension and generalized anxiety disorder and continued her on her prescriptions for Metformin for diabetes, Lisinopril for hypertension, Sertraline for depression, and Klonopin for anxiety. Dr. Reiland also urged the claimant to eat healthy and exercise. (R. 623-625).

The claimant saw LPC Simpson at Southeastern Psychiatric on October 7, 2016 complaining of depression; continued on her prescriptions for Zoloft, Klonopin, and Ambien; and scheduled a follow-up in three months.

In a follow-up visit with Dr. Reiland on December 5, 2016, the claimant's body mass index had dropped by one point. Dr. Reiland did not include "generalized anxiety disorder" under her "Assessments" or "Treatment" sections but did include it in "Past Medical History.

Also, the claimant again reported no symptoms of depression in the two weeks prior to this visit. (R. 627-629).

The claimant returned to Dr. Barnett at Grand View on January 17, March 14, June 13, 2017 for management of her prescriptions for Zoloft, Klonopin and Ambien.  (R. 638).

On July 8, 2017, at the request of claimant's counsel, Dr. Reiland completed a "Physical Capacities Form."  Dr. Reiland noted that the claimant could sit for four hours at a time; could stand for three hours at one time; would need to lie down for two hours during eight-hour daytime period; would be "off-task" for 60% of an eight-hour work day; and would miss work because of her physical symptoms a total of ten days over a thirty-day period.  Dr. Reiland stated that these limitations dated back to May 1, 2014 and were because of her "anxiety, [osteoarthritis, and] neuropathy." She also noted fatigue and sleepiness as side effects of the claimant's medications. (R. 630).

At the request of her attorney, the claimant saw Licensed Psychologist Dr. David Wilson on July 18, 2017 for a psychological evaluation.  Dr. Wilson reviewed all of the claimant's medical and psychiatric records prior to his evaluation of her, and he noted her diagnosis of Panic Disorder with Agoraphobia; "significant impairment in her level of functioning"; treatment for anxiety and panic attacks at Grand View and Southeastern Psychiatric; and diagnosis and treatment for diabetes.  (R. 631).

The claimant explained her history of medications for her anxiety and depression that started two-and-a-half years prior: she tries to only take Ambien when she has not slept for days because it gives her "weird dreams"; taking Paxil "was really bad" because it made her suicidal; on Effexor she "felt like there was a cloud"; but the Zoloft and Klonopin "do help." She said she can go to Dollar General now but not grocery shopping at Walmart or to the movies.  The

claimant also said that she sees her counselor when she "can get up enough money." (R. 631-632).

She described to Dr. Wilson her chaotic upbringing, with an alcoholic father who died when she was four-years-old and a mother who "went crazy" when the claimant told her about a neighbor and his wife who liked to "touch little girls." The claimant told Dr. Wilson about a fifteen-year-old babysitter who raped her sister and her when she was eight years old. (R. 632).

The claimant reported to Dr. Wilson that she has difficulty with anxiety and panic attacks and could not work because "I might have a good day or two but I cannot predict them. I feel like I am on the verge of a panic attack everyday." The claimant also indicated that she could not go out in public without having panic attacks; that she has at least three severe panic attacks a week that overwhelm her; and that she is not able to go to a busy place. She told him that she will "hear a whisper or catch something out of the corner of her eye" because of her anxiety; she has the obsession or compulsion of counting by twos on her fingers to twenty and then do it backwards; and she has difficulty with a picture or photo that is not straight. She has regular crying spells and has suicidal ideation of "saving up my pills and using them" but thoughts of her family "keep her from doing it." (R. 631-633).

The claimant told Dr. Wilson that her appetite was good and that her energy levels were "fine." She makes herself go outside and walk around her neighborhood, which is something she could not do at all two years prior. Her daily activities include taking care of her pets and exercise in the form of aerobics. The claimant stated that she listens to music and reads frequently, and that she has begun doing yard work. She attends New Harmony Baptist Church but "sometimes it is hard for me to be there." Outside of these activities, she watches television and movies with her husband. (R. 633-634).

Dr. Wilson stated that during the interview the claimant exhibited an intact thought process with clear speech at a normal rate; was cooperative and respectful; denied hallucinations or delusions; had good mental control and attention; had adequate short term memory; had very good acquired information; had an average abstract reasoning ability; and possessed an average to slightly above average verbal comprehension.  (R. 631-34).

In his conclusions, Dr. Wilson stated that the claimant presented as a "highly anxious individual who has frequent panic attacks" that occur in busy areas or when she is in public. Dr. Wilson stated the claimant experienced recent PTSD symptoms related to childhood abuse and had become very depressed "about her situation."  His diagnoses included "Panic Disorder with Agoraphobia," PTSD, and Depressive Disorder.  He stated that the claimant "is on medication [that] may be helping, but she still has severe anxiety, panic attacks and depression."  (R. 631-635).

Dr. Wilson concluded that the claimant's "ability to withstand the pressure of day to day occupational functioning is highly impaired[, and it] is unlikely that her status will improve in the next 12 months."  He found she had marked restrictions in her ability to understand, remember, or apply information; to interact with others; to concentrate, persist, or maintain pace; and to adapt or manage herself.  He also found that these limitations existed back to May 1, 2014.  (R. 634-636).

In his "Mental Health Source Statement," Dr. Wilson indicated that the claimant could understand, remember, or carry out very short and simple instructions; could not maintain attention, concentration, and/or pace for at least two hours; could not perform activities within a schedule or be punctual with customary tolerances; could not sustain an ordinary routine without special supervision; could not adjust to routine and infrequent work changes; could not interact

with supervisors; could not interact appropriately with co-workers; could not maintain socially appropriate behavior and adhere to basic standards of neatness or cleanliness; would be off task 60% of an eight-hour work day; and would miss work 20 out of 30 days a month because of her psychological symptoms.  He also noted "negative reactions" from her past medications, including feeling suicidal and having "weird dreams."  (R. 637).

### *The ALJ Hearing*

At the hearing before the ALJ on July 26, 2017, the claimant testified she worked as a cashier at a service station called Jet Pep until 2015. Before her work at Jet Pep, she worked at Mapco as a store manager from 2006 to 2015, where she was responsible for scheduling, payroll, ordering, hiring, and firing. Before her work at Mapco, she worked with Le-Nature's Inc. as an account manager for Alabama from 2005 to 2006, where she acted in a sales representative manager role. Prior to Le-Nature's Inc., she worked at Discount Food, Inc. for four years, initially working as a cashier and working her way up to assistant manager. (R. 60-61).

When asked why she cannot work these jobs, the claimant stated that she "can't handle going out in public" and experiences "extreme panic attacks" brought on by her anxiety.  To cope with her anxiety, the claimant attended counseling sessions every two to three weeks but was unable to afford further sessions. She still sees Dr. Barnett every two to three months to monitor her medication. The claimant takes Zoloft, Klonopin, Metformin, and Ambien.

She testified that the medications made things better and her last "full-blown panic attack" occurred at her son's spring football game in 2017.  During this incident, she began to cry and was unable to breathe. Fearful of embarrassing her son, she sat in her car until the game was over. The claimant indicated that flashbacks to her childhood abuse trigger these feelings of

anxiety. She also stated that her medications cause fatigue and the Zoloft makes her feel "like a zombie." (R. 62-63, 66).

The claimant stated that she has trouble remembering things and she "can't hold a thought." She can go room to room and forget what she is doing, which "makes [her] feel stupid." When someone criticizes the way she handles something, she "shut[s] down" and she has difficulty talking because she begins to stutter. She sometimes goes days without sleeping. She has to lay down for about two hours each day. (R. 67-68).

Regarding her activities, the claimant testified that she takes care of whatever bills they have, cleans the house, and takes her son to school, football, and choral practices. She testified that she will watch him practice football or choral on "a really good day . . . [a]nd if it gets too much, [she has] to go to [her] car and wait for him." She testified that she will typically attend roughly half of her son's football games, and she tries to watch him sing in the church choir but only if it is a "special occasion." She testified that she goes out to eat, but only if her husband accompanies her, and that they sometimes have to leave the restaurant if it becomes too crowded. (R. 63-64).

A vocational expert, Ms. Stricklin, testified concerning the type and availability of jobs that the claimant can perform. Ms. Stricklin testified that the claimant's past relevant work is as store manager and an assistant manager, both classified as light, skilled work. The ALJ asked Ms. Stricklin to assume a hypothetical individual the same age, education, and experience as the claimant who is limited to performing light, unskilled work; cannot have complex instructions or procedures; cannot climb ropes, ladders, or scaffolds; cannot work at unprotected heights or with hazardous machinery; can occasionally stoop, crouch, crawl, and kneel; can be exposed to respiratory irritants, can climb ramps and stairs; and can have interactions with co-workers and

supervisors. Ms. Stricklin testified that individual could not perform the claimant's past work, but could work as a "laundry worker," classified as light work, with 75,000 jobs in the national economy; as a "shipping and receiving weigher," classified as light work, with 2,000 jobs in the national economy; and as an "electrical accessory assembler," classified as light work, with 7,000 jobs in the national economy.  (R. 68-69).

In his second hypothetical, the ALJ asked Ms. Stricklin to assume all of the prior limitations except that the individual must have "an allowance to be off task up to 20% of an eight-hour work day." Ms. Stricklin testified that individual would not be able to perform the jobs listed, or any other job in the national economy. (R. 70).

In his third hypothetical, the ALJ asked Ms. Stricklin to consider the original hypothetical except that the individual would need an allowance to miss three or more days per month. Ms. Stricklin testified that individual could not work in the jobs listed or in any job in the national economy. (R. 70).

## *The ALJ's Decision*

On September 26, 2017, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirement of the Social Security Act through December 31, 2018, and had not engaged in substantial gainful activity since her alleged onset date of May 1, 2014. (R. 12).

Next, the ALJ found that the claimant had the severe impairments of obesity; depression; anxiety; personality disorder; and diabetes. But the ALJ found that the claimant's hypertension was stable and that her PTSD caused only minimal limitations on her ability to perform basic mental work activities, making both nonsevere.

The ALJ next found that the claimant did not have a mental impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13).  The ALJ considered whether the claimant met the criteria for Listings 12.04, 12.06, 12.08, and 12.15 dealing with mental impairments, but concluded that the claimant only had moderate or mild limitations in her ability function.

In her ability to understand, remember, or apply information, the ALJ found that the claimant was moderately limited. He noted that, although she complained of memory problems, her husband helps her remember to take her medication.  The ALJ also stated that, although the claimant has stated that she does not follow instructions well and gets easily distracted, the claimant "has not attributed any of these symptoms to PTSD."  The ALJ also pointed to Dr. Flemming's opinion that stated that the claimant could understand, remember, and carry out instructions. The ALJ also stated that the claimant "consistently demonstrates a normal memory during treatment encounters, although Dr. Fleming noted that her delayed recall was deficient as she was only able to remember two or five objects after a five to ten-minute delay." (R. 14).

Regarding the claimant's ability to interact with others, the ALJ concluded that the claimant only had moderate limitations. The claimant reported difficulty "getting along with others" and having panic attacks when attending school functions. However, the ALJ noted that the claimant attends roughly half of her son's football games each year.  The ALJ acknowledged that the "claimant indicated that she cannot go out in public without her husband and does not go anywhere on a regular basis," but the ALJ pointed out that "the evidence or record reveals that she attends church and has been able to leave home on her own."  The ALJ also stated that the "claimant consistently presents as pleasant, cooperative, and respectful with a good attitude and appropriate behavior."  He also stated that, regarding her PTSD, the claimant does not like being

touched by anyone, but the ALJ concluded that limitation was mild.  But taking all of her limitations in this area into account, the ALJ concluded that the claimant's social functioning was moderately affected. (R. 14).

Regarding concentration and maintaining pace, the ALJ concluded that the claimant has only a moderate limitation. Although the claimant stated she has the inability to pay attention for longer than fifteen minutes, the ALJ noted that the claimant also admitted her ability to focus on reading for at least one hour at a time. Additionally, the ALJ pointed out that the claimant admitted that she is able to handle household bills, which the ALJ determined required some degree of concentration and persistence. He also noted that the claimant has not alleged that her PTSD affects her concentration or pace and concluded that these "objective findings establish . . . that the claimant consistently demonstrates adequate attention and concentration with good mental control [in addition to] adequate motivation, establishing that she is able to persist and maintain pace." (R. 14-15).

The ALJ also concluded that the claimant experiences mild limitations in adapting or managing herself. The ALJ noted that the claimant can care for her husband, son, and pets, becoming anxious when her family is not with her; can perform housework, but is helped by her mother when the claimant is depressed; and sometimes does not bathe when she is depressed. However, the ALJ stated that the claimant is able to drive, transporting her son to football and choral practices. The ALJ determined that, contrary to her claims, the claimant consistently presents with appropriate grooming. Additionally, while displaying an anxious, depressed mood at times, the claimant "often exhibits an appropriate mood and affect, consistently demonstrating normal thought processes and thought content."  (R. 15)

Because the claimant did not have at least two "marked" limitations or one "extreme" limitation in any area of mental functioning, the ALJ found that the claimant did not meet a listing for her mental impairments.

The ALJ found that the claimant has the residual functional capacity to perform light, unskilled work, with the following limitations:  cannot follow complex instructions or procedures; cannot  climb ropes, ladders, or scaffolds; cannot work at unprotected heights or with hazardous machinery; can occasionally stoop, crouch, crawl, or kneel; cannot have concentrated exposure to dust, fumes, or other respiratory irritants; can occasionally climb ramps or stairs; can have frequent interaction with co-workers and supervisors; and can have occasional contact with the general public.

In making his residual functional capacity determination, the ALJ found that the claimant's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms; however, the ALJ found that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  The ALJ also stated that the "evidence of record does not provide objective support for her allegations of disabling mental impairments." (R. 19).

The ALJ stated that, although the claimant reports social anxiety and withdrawal, "she has made progress in this area and is able to attend church, go out to eat, and shop in smaller stores."  He also stated that "[d]espite her allegations of memory impairment and concentration deficits, she generally exhibits no difficulties in these areas."  The ALJ pointed out that "[r]ecent treatment notes indicate she mainly talks about family stressors and situational issues rather than true mental illness."

The ALJ gave "good weight " to the opinions of examining psychologist Dr. Samuel Fleming. The ALJ noted that Dr. Fleming's conclusions of mild depression were "well supported by his detailed evaluation notes, although the mental health treatment notes indicate that the claimant is slightly more limited than he concluded." (R. 19)

Additionally, the ALJ gave "little weight" to the opinions of treating physician Dr. Debora Reiland. The ALJ determined that Dr. Reiland's opinions were not supported by her treatment notes, "which reveal[ed] generally normal findings upon examination, and [were] not consistent with the overall evidence of record." Specifically, the ALJ stated that Dr. Reiland provided no objective support for opining that the claimant would be off task sixty percent of an eight-hour work day and would miss ten days per month. (R. 20).

The ALJ also gave little weight to the opinions of Dr. David R. Wilson. The ALJ stated that the claimant's daily activities directly contradicted Dr. Wilson's opinions, "particularly his conclusion that [the claimant] is unable to sustain an ordinary routine without supervision." The ALJ also indicated that Dr. Wilson's own treatment notes contradicted his opinions. Specifically, the fact that Dr. Wilson observed the claimant's "timely presentation, cooperative behavior, appropriate behavior, and good mental control and attention" cut against Dr. Wilson's opinion that she is unable to "maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, or maintain attention for two-hour periods." The ALJ determined that Dr. Wilson's conclusions were not supported by objective facts. (R. 20).

Finally, the ALJ found that the claimant was unable to perform any of her past relevant work, but could work as a "laundry worker," with approximately 75,000 jobs in the national economy; as a "shipping and receiving weigher," with approximately 10,000 jobs in the national economy; and as an "electrical accessory assembler," with approximately 7,000 jobs in the

national economy. The ALJ relied on the testimony of the VE, Norma Stricklin, who testified

that the claimant would be able to perform occupations at the light level of exertion. Thus, the

ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R.

21-22).

## VI. DISCUSSION

The claimant argues that the ALJ failed to accord proper weight to the opinion of

consulting, examining physician Dr. David Wilson. This court agrees and finds that substantial

evidence does not support the ALJ's articulated reasons for discounting Dr. Wilson's opinion.

The ALJ gave little weight to Dr. Wilson's opinion that the claimant has marked

limitations in her mental functioning because the "claimant's daily activities as described in Dr.

Wilson's report contradict his opinions, particularly his conclusion that she is unable to sustain

an ordinary routine without supervision."  (R. 20).  But the ALJ fails to explain *which* daily

activities contradict or specifically *how* those daily activities support that she does not have

marked limitations in areas of her mental functioning or how she could sustain an ordinary

routine without supervision in a work setting.

The ALJ must identify a *genuine* inconsistency and explain how the claimant's daily

activities are inconsistent with Dr. Wilson's opinions.  *See Schink v. Comm'r of Soc. Sec.*, 935

F.3d 1245, 1262-63 (11th Cir. 2019).  As the Circuit Court explained, to discount a medical

opinion as inconsistent, the ALJ "must identify a genuine 'inconsisten[cy].  It is not enough to

merely point to positive or neutral observations that create, at most, a trivial and indirect tension

with the [doctor's] opinion by proving no more than that the claimant's impairments are not all-

encompassing." *Id*. (citations omitted).  Without an explicit explanation as to which activities

were inconsistent or how they are inconsistent with Dr. Wilson's conclusions, the court cannot ascertain whether substantial evidence supports the ALJ's reason.

And the court has reviewed the entire record and specifically Dr. Wilson's opinion and can find no activities of daily living reported by the claimant that would negate Dr. Wilson's opinion that the claimant has marked limitation in several areas of her mental functioning. The daily activities that the claimant reported to Dr. Wilson were that she has to make herself go outside and walk around her neighborhood, takes care of her pets, watches television with her husband, reads, listens to music, does some yard work, attends church sometimes but it is hard for her to be there, and sometimes exercises. But these activities are not inconsistent with any of the claimant's mental limitations assessed by Dr. Wilson.

None of these reported daily activities negate Dr. Wilson's opinions that the claimant could understand, remember, or carry out only very short and simple instructions; could not maintain attention, concentration, and/or pace for at least two hours; could not perform activities within a schedule or be punctual with customary tolerances; could not sustain an ordinary routine without special supervision; could not adjust to routine and infrequent work changes; could not interact with supervisors; could not interact appropriately with co-workers; could not maintain socially appropriate behavior; could not adhere to basic standards of neatness or cleanliness; would be off  task 60% of an eight-hour work day; and would miss work 20 out of 30 days a month because of her psychological symptoms.  (R. 631-637).  The claimant's reported daily activities do *not* require the ability to understand complicated instructions, maintain concentration for extended periods of time, interact with others on a consistent basis, or maintain a schedule similar to working full-time five days a week.  And the claimant's ability to sometimes go to church is not indicative of an ability to consistently work around people or

reliably show up for work every day for five days a week and interact with others on a regular basis.  *See Meade v. Comm'r Soc. Sec.*, 807 F. App'x 942, 947 (11th Cir. 2020) (The Court was "unclear" how the claimant's ability to consistently show up for medical appointments monthly "was indicative of her ability to reliably report to work on a daily or near-daily basis.").

Her reported daily activities were simple activities that do not conflict with Dr. Wilson's conclusions regarding the claimant's mental functioning.  *See Meade*, 807 F. App'x  at 947 (citing *Schink*, 935 F.3d at 1264) (the ALJ's reliance on the claimant's ability to engage in solitary activities, such as watching television or walking the dog, was not a basis to discount opinion regarding the claimant's mental functioning abilities). The fact that she can do these simple activities does not contradict Dr. Wilson's conclusion that the claimant's "ability to withstand the pressure of day to day occupational functioning is highly impaired[, and it] is unlikely that her status will improve in the next 12 months."  The demands and stressors of mental functioning at home or in the community are different from the occupational mental stressors of working a full-time job.  According to the Social Security Regulations, "If you are able to use an area of mental functioning at home or in the community, we will not necessarily assume that you would also be able to use that area of function in a work setting where the demands and stressors differ from those at home."  20 C.F.R. § 404, Subpart P, Appendix 1, Listing 12:00(F)(3)(c).  So, the claimant's ability to do these simple activities alone or with her husband do not equate to her being able to withstand the mental stressors of working full-time with her mental limitations.

These simple activities show that she can sometimes go outside, sometimes go to church, or engage in simple activities around her house, but they do not negate the fact that the claimant has the diagnoses of "Panic Disorder with Agoraphobia," PTSD, and Depressive Disorder on

which Dr. Wilson rendered his opinions.  The record supports these diagnoses and the claimant has sought treatment for anxiety, panic attacks, and depression since 2014.  Someone with these diagnoses could do the activities reported by the claimant and still suffer from debilitating mental limitations that could prevent her from being able to work a full-time job.  On remand, the ALJ should specifically discuss how the claimant's activities are genuinely *inconsistent* with Dr. Wilson's opinion.

The ALJ also discounted Dr. Wilson's opinion because "despite observing presentation, cooperative behavior, appropriate grooming, and good mental control and attention, Dr. Wilson opined that she could not maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, or maintain attention for two hours."  (R. 20).  Again, the facts that the claimant on this particular day cooperated with Dr. Wilson, was adequately groomed and had good attention during the examination do not contradict Dr. Wilson's findings regarding her mental functioning.  The fact that the claimant had appropriate grooming for this particular appointment does not negate that she has many days in a row that she does not bathe or adequately groom herself.  And the fact that she could interact cooperatively in a structured one-on-one conversation with a mental health professional is not inconsistent with someone who has mental limitations that would prevent her from working around other people on a consistent basis in a full-time job. *See Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1264 (11 th Cir. 2019) ("[I]t is not inconsistent-or even that unlikely-that a patient with a highly disruptive mood disorder, in a structured one-on-one conversation with a mental health professional, might be capable of 'be[ing] redirected' from his 'tangential' thought processes as to 'remain on topic.'").

And the court has concerns about the ALJ giving "good"weight to Dr. Fleming's opinion that lacked any explanation for his statements about the claimant.  Dr. Fleming noted that the

claimant "did not demonstrate good psychological insight. She did not accept responsibility for her problems. She does appear to recognize a need for psychotherapeutic assistance; however this seems to be more a desire for attention rather than recognition for her need to work on problem issues." (R. 528-529). But Dr. Fleming did not explain anywhere in his opinion on what he based his belief that the claimant desired attention and did not really want to work on her problem issues. He stated that the claimant was cooperative and put forth good effort, but then he states that she really liked the attention. The ALJ did not mention these statements by Dr. Fleming, but indicated that the claimant was more limited than what Dr. Fleming opined. Again, the court is unclear on what facts or observations Dr. Fleming based these statements or on what he based his diagnosis of "Dependent Personality Disorder." On remand, the ALJ may want to ask Dr. Fleming to further explain his statements.

Because the ALJ did not explain the genuine inconsistencies he found between Dr. Wilson's medical opinions and the claimant's reported daily activities and the court can find no genuine inconsistencies, the court finds that substantial evidence does not support the reasons that the ALJ gave to discount Dr. Wilson's opinions that the claimant has marked mental limitations.

## VII. CONCLUSION

For the foregoing reasons, the court will REVERSE and REMAND the decision of the Commissioner for further action consistent with this opinion.

The court will enter a separate Order to that effect.

DONE and ORDER this 25th day of September, 2020.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE